UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TAMIKO J. DAVIS,

        Plaintiff,

vs.                                                        Case No.  3:06-cv-167-J-MCR

JO ANNE B. BARNHART, Commissioner of
the Social Security Administration,

        Defendant.
_____/

### MEMORANDUM OPINION AND ORDER[1]

This cause is before the Court on Plaintiff's appeal of an administrative decision denying her application for Social Security benefits.  The Court has reviewed the record, the briefs and the applicable law.  For the reasons set forth herein, the Commissioner's decision is **REVERSED** and **REMANDED** for proceedings not inconsistent with this opinion.

### I.    PROCEDURAL HISTORY

Plaintiff filed applications for a period of disability and disability insurance benefits ("DIB") as well as Supplemental Security Income ("SSI") payments on February 26, 2002, alleging an inability to work since October 1, 1999.  (Tr. 46-46, 525-29).  The Social Security Administration ("SSA") denied these applications initially and upon reconsideration. (Tr. 27-29, 530-33).  Plaintiff then requested and received a hearing before an Administrative Law Judge (the "ALJ") on July 29, 2004.  (Tr. 37, 544-60).  On November 10, 2004, the ALJ issued a decision finding Plaintiff was not disabled.  (Tr. 16-25).  On December 13, 2004,

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Doc. 8).

Plaintiff filed a Request for Review by the Appeals Council.  (Tr. 12).  The Appeals Council

subsequently denied Plaintiff's request for review.  (Tr. 6-9).  Accordingly, the ALJ's

November 10, 2004 decision was the final decision of the Commissioner.  Plaintiff timely

filed her Complaint in the U.S. District Court on February 21, 2006.  (Doc. 1).

## II.    NATURE OF DISABILITY CLAIM

### A.    Basis of Claimed Disability

Plaintiff claims to be disabled since October 1, 1999, due to carpal tunnel syndrome,

back pain, depression, anxiety and mood swings.  (Tr. 59).

### B.    Summary of Evidence Before the ALJ

On the date the ALJ's decision was issued, Plaintiff was thirty-six years of age.   (Tr.

17, 546).  She is a high school graduate and was in the process of completing her second

year of community college at the time of the hearing.  (Tr. 547).  Plaintiff has past relevant

work as a salesperson in an athletic shoe store, a landscaper, tile setter, caretaker and car

wash attendant.  (Tr. 68-77).  Plaintiff's medical history is discussed in the ALJ's decision

and will be summarized here.

#### 1.    Plaintiff's Physical Impairments

The medical records submitted reveal that on October 14, 1994, Plaintiff was

involved in an automobile accident.  She sustained multiple fractures; including to the rib,

pubic area, and left humerus.  (Tr. 282-283).  She underwent surgery to repair the left

humerus fracture and subsequently underwent a series of nerve blocks due to ongoing arm

pain through 1995.  (Tr. 234-237, 253-254, 259-260, 262-264).

In 2001, Plaintiff underwent bilateral carpal tunnel releases, however, by January

2002, her symptoms had returned.  In May 2002, Plaintiff was referred to a rheumatologist, Dr. Pacetti, after complaining about constant pain in her low back, hands, fingers and arms. Examination revealed painful joint range of motion and a positive sensory deficit of all fingers with muscle atrophy.  Plaintiff was diagnosed with probable fibromyalgia.  (Tr. 377-78).  On September 25, 2002, Dr. Pacetti again examined Plaintiff.  (Tr. 443).  Plaintiff complained of pain throughout her body.  Dr. Pacetti suspected Plaintiff suffered from fibromyalgia or psychosomatic disorder with irritable bowel syndrome, depression, and insomnia but did not believe Plaintiff had SLE.  Id.

On December 23, 2002, Plaintiff underwent a consultative examination by Dr. Timothy McCormick.  (Tr. 431-433A).  Plaintiff complained of pain all over her body but stated it was most intense in her lower back area.  (Tr. 431).  Plaintiff also referenced her depression and claimed her medication was not helping.  (Tr. 432).  Dr. McCormick reported Plaintiff's affect was flat, she moved slowly and grimaced with palpation of the legs and arms.  (Tr. 433).  Plaintiff's grip strength in her hands seemed weak, but Dr. McCormick found it could be related to her effort and found her fine manipulation normal.  Id.  Dr. McCormick found Plaintiff to be functioning at a light to sedentary activity level and opined that she was probably not suitable for hand intensive work activities.  (Tr. 433A).

### 2. Plaintiff's Mental Impairments

The record also reveals Plaintiff suffered from depression for a number of years.[2]  On November 6, 1998, Plaintiff underwent an initial evaluation at the Psychiatry department for University Medical Center.  (Tr. 222-225).  Plaintiff reported she ran away for one to two

---

[2]  Indeed, on March 14, 2000, Plaintiff reported she had been seeing a therapist for 7 - 8 years.  (Tr. 218).

weeks at a time, whereby she disconnected herself from her roommates.  (Tr. 222).  Plaintiff

described herself as irritable, labile, having mood swings, and dealing with abandonment all

her life.  Id.  Plaintiff further described herself as fearful of losing control of her anger and

claimed she had racing thoughts and flashbacks secondary to abuse, as well as decreased

motivation, concentration, and energy.  (Tr. 222-23).   Prior to the examination, Plaintiff had

five attempts at suicide with overdose and one attempt with a knife to her abdomen when

intoxicated.  Her last suicide attempt was in 1997.  (Tr. 224).  She was assigned a Global

Assessment of Functioning ("GAF") score of 55.[3]  (Tr. 222).

Dr. Christianson, a psychiatrist at Shands, examined Plaintiff on October 10, 2000

and November 17, 2000.  (Tr. 208-210).  Plaintiff felt she was doing better and was less

depressed, but was still having relationship difficulties.  She had thoughts of anger and was

diagnosed with dysthymia[4] and borderline personality disorder.  (Tr. 209-210).  On

November 17, 2000, Plaintiff had increased difficulty with memory and anxiety levels.  (Tr.

208).

On December 3, 2000, Plaintiff was admitted to Memorial Hospital as a result of a

suicide attempt.  (Tr. 178-203).  She was Baker-Acted and brought to the hospital via

---

[3] The Global Assessment of Functioning Scale ("GAF") ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for self). Diagnostic and Statistical Manual of Mental Disorders--Fourth Edition ("DSM-IV") 32 (4th ed. 1994).  A score between 51 to 60 is defined as manifesting "moderate symptoms" (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM-IV at 32.

[4] Dysthymia is defined as "a mood disorder characterized by depressed feeling and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression."  Dorland's Illustrated Medical Dictionary 519 (28th Ed. 1994).

rescue.  She was diagnosed with drug overdose with suicidal intention.  Plaintiff admitted she tried to kill herself because she had nothing to live for and had been severely depressed.  On December 5, 2000, Plaintiff was admitted to the Crisis Stabilization Unit where she underwent a mental examination with Dr. Benjamin Lye, M.D.  During the examination, Dr. Lye noted Plaintiff cried, her mood was depressed and her attention span was reduced.  (Tr. 201).  Plaintiff still entertained suicidal ideation.  Her prognosis was guarded and she was assigned a GAF score of 40.[5]  Id.  Upon discharge, Dr. Lye diagnosed Plaintiff with posttraumatic stress disorder, rule out personality disorder and assigned her a GAF score of 50.[6]  (Tr. 199).

From December 2000, Plaintiff regularly attended therapy sessions with a licensed mental health counselor for her depression.  (Tr. 315-330, 429-430).  On May 20, 2002, Plaintiff reported suicidal ideation, was tearful, and claimed to be in intense pain.  (Tr. 324).  Plaintiff described listening to a CD with lyrics about suicide on June 3, 2002 and claimed ever since that time, she felt compelled to take her life.  (Tr. 324-25).  On June 7, 2002, Plaintiff was tearful and had thoughts of self-destruction with no plans.  (Tr. 325).  On June 27, 2002, Plaintiff reported being unhappy with taking medication and admitted reducing her antidepressants on her own.  Id.  In November 2002, Plaintiff reported being very depressed after a break-up and reported suicidal ideation.  (Tr. 430).  On November 26, 2002, Plaintiff

---

[5]  A GAF score of 31 to 40 is defined as manifesting "impairment in reality testing or communication" (e.g., speech is illogical at times, obscure, or irrelevant) or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood" (e.g., depressed woman avoids friends, neglects family, and is unable to work.)  DSM-IV at 32.

[6]  A score between 41 to 50 is defined as manifesting "serious symptoms" (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job).  DSM-IV at 32.

appeared at her session dressed like the unibomber and reported suicidal thoughts.  Id.
She stated she was at peace and that she was supposed to die.  Her Effexor dose was
decreased and she was given Paxil.  Id.

On April 16, 2002, Dr. Christianson completed a disability form, stating that Plaintiff
suffered from a mental impairment which significantly interfered with her daily functioning.
(Tr. 285).  Dr. Christianson noted he had last evaluated Plaintiff on November 7, 2001 but
stated Plaintiff continued to be seen at the clinic by other physicians.  (Tr. 286).  Dr.
Christianson reported Plaintiff's mood as down and her affect as constricted.  Id.  He noted
that Plaintiff had been diagnosed with dysthymic disorder and borderline personality
disorder.  (Tr. 287).  Finally, Dr. Christianson noted Plaintiff had significant interpersonal
deficits, poor affective regulation, and poor impulse control which significantly impaired her
ability to consistently participate in competitive employment.  Id.

The other doctor Plaintiff regularly visited at Shands was Dr. Hazem Herbly.  On May
7, 2002, an examination by Dr. Herbly revealed Plaintiff was having difficulty sleeping some
nights and described having flashbacks.  (Tr. 379).  Plaintiff reported she had enrolled in
college and that she had ambivalent feelings about it.  Id.  Plaintiff also reported a decrease
in irritability in tolerating frustrations in traffic and the mental status examination showed
some psychomotor retardation, neutral mood, constricted affect but no active suicidal
ideation.  Id.

On June 14, 2002, Susan Conley, Ph.D., a state agency medical consultant,
completed a Psychiatric Review Technique form ("PRTF") on Plaintiff.  (Tr. 292-305).  Dr.
Conley determined Plaintiff's depression and personality disorder caused her the following
limitations:  mild restrictions in activities of daily living; moderate difficulties in maintaining

social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation, each of extended duration.  (Tr. 302).

Dr. Conley also completed a mental RFC for Plaintiff in which she found Plaintiff had moderate limitations in her ability to maintain attention and concentration for extended periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 288-89).  Dr. Conley opined that "[w]ith some adjustment for difficulty working with public and authority, [Plaintiff] appear[ed] able to perform a single repetitive task."  (Tr. 290).

Meanwhile, Plaintiff continued to be treated by Dr. Herbly for depression.  (Tr. 358, 361-362).  On July 3, 2002, Plaintiff claimed her sleep had been poor for the past week and reported multiple stressors.  (Tr. 361).  Plaintiff reported that her gynecologist started her on Prozac.  Id.  Dr. Herbly instructed Plaintiff to continue her Effexor and Neurontin and to stop the Prozac.  Id.  On August 12, 2002, Plaintiff stated she was happy with her current medication treatment plan and that she was doing well in school.  She also reported enjoying her time with Alcoholics Anonymous, stated that she would be sponsoring some other members and would be speaking to the group.  (Tr. 358).  However, Plaintiff also reported feelings of being followed when driving.  Examination revealed her mood as euthymic with possible early psychotic features of paranoia, feelings of being followed.  Id.

On October 4, 2002 Dr. Herbly re-examined Plaintiff.  (Tr. 351-352).  Plaintiff reported that she continued to take classes but it was difficult secondary to pain and her irritability. (Tr. 351).  Plaintiff further reported having angry thoughts toward other people and becoming aggravated when driving.  Id.  Dr. Herbly noted Plaintiff was ambulating slowly

7

with some evidence of pain, her speech was slow and she showed great concern that she would lose her temper.  Id.  Her mood was depressed and angry.  Id.

On October 12, 2002, a second state agency medical consultant, Steven L. Wise, Psy.D., completed another PRTF and determined Plaintiff had the following limitations:  mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation, each of extended duration.  (Tr. 345).  Again, Dr. Wise also completed a mental RFC for Plaintiff in which he found she had moderate limitations only in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 332).  Dr. Wise believed Plaintiff retained adequate mental ability to perform full-time competitive work but noted she was "expected to be somewhat inconsistent in performance over time, but capable of routine tasks."  (Tr. 333).

On December 28, 2002, Plaintiff was again transported to the hospital after a suicide attempt by pill ingestion.  Plaintiff was admitted to the Mental Health Resource Center from December 29, 2002 to December 31, 2002.  (Tr. 459-464).  Plaintiff reported she stopped taking her medication because a P.A. told her she could.[7]  (Tr. 461).  She was diagnosed with posttraumatic stress disorder and major depression, rule out substance abuse and personality disorder.  She was assigned a GAF score of 40.  (Tr. 463-464).  At discharge, Plaintiff was diagnosed with major depressive disorder, recurrent and severe with psychotic features, showing positive response to medication.  She was assigned a GAF score of 60.

---

[7] Plaintiff also reported that she stopped taking her medication because she did not feel she needed it.  (Tr. 463).

(Tr. 459-460).

On February 7, 2003, Plaintiff reported to her therapist that several people forgot her birthday and as a result, Plaintiff felt like harming herself.  (Tr. 506).  She appeared very tired, depressed, and had suicidal thoughts.  Id.  Dr. Herbly examined Plaintiff on February 20, 2003 and noted her mood was anxious and angry.  (Tr. 492).  Dr. Herbly also noted Plaintiff was not taking her Neurontin as directed.  Id.  During her May 14, 2003 examination with Dr. Herbly, Plaintiff reported doing better, obtaining a new job, getting along better with others and having less irritability and feelings of anger.  (Tr. 489).  Again, in June 2003, Plaintiff reported doing well to Dr. Herbly.  (Tr. 487).  On July 28, 2003, Dr. Herbly noted Plaintiff had been doing well with the exception of some road rage symptoms and some irritability that bordered on violent.  (Tr. 485).  Dr. Herbly increased Plaintiff's Effexor dose. Id.

 On March 4, 2004, Plaintiff told Dr. Herbly she had some difficulty with sleep since stopping the Neurontin secondary to her inability to pay for it.  (Tr. 519).  Dr. Herbly noted Plaintiff's mood had improved but that her affect was somewhat constricted.  Id.  Dr. Herbly re-examined Plaintiff in April and May 2004.  (Tr. 515-517).  Plaintiff was still unable to afford her medications and had to rely on samples.  Id.  She was given a prescription for Lithium to add to her current medications.  (Tr. 517).  On May 27, 2004, Dr. Herbly instructed Plaintiff to stop taking Neurontin due to her lack of finances.  (Tr. 515).

Plaintiff again made suicidal comments to her therapist in August 2003 and became suicidal when she experienced difficulties with her car in December 2003.  (Tr. 500, 500A). Plaintiff reported to her therapist that she again tried to commit suicide in January 2004 by cutting herself with a knife. (Tr. 496).  Additionally, on June 1, 2004, Plaintiff stated she had

been suicidal and even took two pills, but stopped to call a friend.  (Tr. 511).

On July 29, 2004, Jalide A. Ojan PA at Shands Clinic provided a letter to Social Security regarding Plaintiff's condition.  (Tr. 523).  The letter stated Plaintiff was a patient in the mental health clinic and her course of treatment was complicated by financial constraints, which limited her ability to afford her medications.  The letter further provided that Plaintiff continued with issues of depression, irritability, and anger control, which impaired her ability to work with others.  Id.

### C.   Summary of the ALJ's Decision

A plaintiff is entitled to disability benefits when she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than 12 months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.  The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  29 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.  20 C.F.R. § 404.1520(f).  Plaintiff bears the burden

10

of persuasion through step four, while at step five, the burden shifts to the Commissioner.

Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287 n.5 (1987).

In the instant case, the ALJ determined Plaintiff met the nondisability requirements of the Act and was insured for benefits through the date of the decision.  (Tr. 17, 24).  At step one, the ALJ found Plaintiff had engaged in substantial gainful activity since her alleged onset date, October 1, 1999.  (Tr. 17, 24).  Specifically, the ALJ noted that since her alleged onset date, Plaintiff had worked as a clerk in a shoe store one day per week, five hours per day and as a landscaper four days per week for four hours each day.  (Tr. 17).  Additionally, the ALJ pointed out that during the hearing, Plaintiff testified she was working twenty hours a week at a bookstore and had been working at a community college on a part-time basis.

Id.  Despite these findings, the ALJ gave Plaintiff the benefit of the doubt and continued on with the remaining analysis.  Id.

At steps two and three, the ALJ held:

> The medical evidence thus indicates that the claimant has history of bilateral carpal tunnel syndrome status-post bilateral releases and fibromyalgia versus psychosomatic disorder, impairments that are "severe" within the meaning of the Regulations.

(Tr. 20).  The ALJ further determined these impairments were not "severe enough to meet or medically equal, either singly or in combination, [] any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  (Tr. 21).  However, with respect to Plaintiff's history of affective disorders, anxiety-related disorder, and borderline personality disorder, the ALJ found they were not severe.  (Tr. 20).

The ALJ determined Plaintiff retained the residual functional capacity ("RFC") for light exertional level work.  (Tr. 24).  Specifically, the ALJ found Plaintiff could "either sit or

11

stand/walk for at least six hours in an eight-hour workday" and could "lift and carry 20 pounds occasionally and 10 pounds frequently."  Id.  Additionally, the ALJ determined that because of her carpal tunnel syndrome, Plaintiff should not engage in repetitive use of her hands such as for keyboarding.  Id.  Finally, the ALJ also found Plaintiff had no more than mild limitations on her ability to "sustain concentration, persistence, and pace and interact appropriately with others." Id.  In making his findings regarding Plaintiff's RFC, the ALJ found Plaintiff's testimony concerning her symptoms and limitations not credible to the extent Plaintiff claimed she was disabled and precluded from all work activity.  (Tr. 22).

At step four, the ALJ determined Plaintiff retained the ability to perform her past relevant work as a salesperson in an athletic shoe store as she actually performed the job. (Tr. 24).  Therefore, the ALJ found Plaintiff was not disabled within the meaning of the Social Security Act.  Id.

## III.   ANALYSIS

### A.   The Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson, 402 U.S. at

401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

### B.    Issues on Appeal

Plaintiff argues three issues on appeal.  First, Plaintiff believes the ALJ erred in finding she retained the RFC to perform her past work as a salesperson as she actually performed it.  (Doc. 14, pp. 9-13).  Next, Plaintiff claims the ALJ erred in failing to find her mental impairments severe.  (Doc. 14, pp. 13-17).  Finally, Plaintiff argues the ALJ erred in finding she had engaged in substantial gainful activity after the onset date of her disability.  (Doc. 14, pp. 17-18).  The Court will examine each of these claims.

### Whether the ALJ erred in determining Plaintiff's RFC and ability to perform her past relevant work.

Plaintiff argues the ALJ erred in finding she was able to return to her past work as a salesperson in an athletic shoe store as she performed it.  Social Security Ruling 82-61 provides that a claimant can return to past relevant work if she can perform the specific job she performed, either in the manner she performed it, or as it is usually performed in the national economy.  In the instant case, the ALJ determined Plaintiff could return to her past

work as a salesperson as she performed it.  (Tr. 24).  Plaintiff points out that the ALJ

determined Plaintiff retained the RFC to "either sit or stand/walk for at least six hours in an

eight-hour workday" and to "lift and carry 20 pounds occasionally and 10 pounds frequently."

(Tr. 24).  However, he specifically found Plaintiff's past work as a salesperson in an athletic

shoe store required her to walk and/or stand for 4 to 8 hours per day and to lift no more than

20 to 30 pounds.  Id.  Accordingly, based on the ALJ's specific findings, Plaintiff's RFC

would not allow her to perform the salesperson job as she actually performed it.  As such,

the Court finds the ALJ erred.

Social Security Ruling 82-62 provides:

> The decision as to whether the claimant retains the functional
> capacity to perform past work which has current relevance has
> far-reaching implications and must be developed and explained
> fully in the disability decision.  Since this is an important and, in
> some instances, a controlling issue, every effort must be made
> to secure evidence that resolves the issue as clearly and
> explicitly as circumstances permit.

> Sufficient documentation will be obtained to support the decision.
> Any case requiring consideration of PRW will contain enough
> information on past work to permit a decision as to the
> individual's ability to return to such past work (or to do other
> work).  Adequate documentation of past work includes factual
> information about those work demands which have a bearing on
> the medically established limitations.  Detailed information about
> strength, endurance, manipulative ability, mental demands and
> other job requirements must be obtained as appropriate.  This
> information will be derived from a detailed description of the work
> obtained from the claimant, employer, or other informed source.
> Information concerning job titles, dates work was performed, rate
> of compensation, tools and machines used, knowledge required,
> the extent of supervision and independent judgment required,
> and a description of tasks and responsibilities will permit a
> judgment as to the skill level and the current relevance of the
> individual's work experience.

SSR 82-62.  In the instant case, the only information regarding Plaintiff's past work as a

14

shoe salesperson comes from the work history form she completed in April 2002.  (Tr. 74).

In this report, Plaintiff indicated the heaviest weight she lifted was 20 to 30 pounds and that

she frequently lifted 20 to 30 pounds.  Id.  Additionally, Plaintiff noted that she stood/walked

approximately 4 to 8 hours per day.  Id.  During the hearing, the ALJ did not question

Plaintiff about her past work as a salesperson.  On remand, the ALJ should develop the

record further regarding Plaintiff's duties in her past work before determining whether she

can return to that work as she actually performed it.

The Commissioner's argument that such error is harmless because Plaintiff's RFC

would permit her to perform the salesperson job as it is generally performed in the national

economy is without merit.  The Commissioner is correct that the Dictionary of Occupational

Titles (the "DOT") lists the lifting requirement for a shoe salesperson as 20 pounds

occasionally and up to 10 pounds frequently.  (Doc. 15, Ex. 2).  Clearly, Plaintiff's RFC

would permit her to perform these tasks.  However, as Plaintiff points out, the DOT also

notes that this position requires constant handling and frequent fingering.  Id.  The ALJ

noted that because of her history of carpal tunnel syndrome, Plaintiff could not "engage in

repetitive use of the hands such as for keyboarding."  (Tr. 24).  As such, the Court is not

convinced Plaintiff's RFC as determined by the ALJ would permit her to perform the

salesperson job as it is performed in the general economy.  Accordingly, the ALJ's error in

determining Plaintiff could perform her past relevant work was not harmless and the Court

will direct that this case be remanded.  On remand, if the ALJ determines Plaintiff's RFC will

not permit her to perform the salesperson job as she previously performed it, he shall make

explicit findings regarding whether her RFC would allow her to perform the position as it is

generally performed in the national economy.

## Whether the ALJ erred in failing to find Plaintiff's
## mental impairments were severe.

Plaintiff also argues the ALJ erred in failing to find her mental impairments were severe.  Specifically, Plaintiff claims the ALJ ignored the medical evidence showing her mental impairments were severe and instead, substituted his own beliefs.  (Doc. 14, pp. 13-17).

At step two, the ALJ is called upon to determine whether a claimant's impairments are severe.  By definition, this is a "threshold inquiry."  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986).  In Brady v. Heckler, 724 F.2d 914, 920 (11th Cir.1984), the Eleventh Circuit held that "[a]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  Brady, 724 F.2d at 920.  As the McDaniel court noted, the analysis at step two "allows only claims based on the most trivial impairments to be rejected."  McDaniel, 800 F.2d at 1031.  "Claimant need show only that her impairment is not so slight and its effect is not so minimal."  McDaniel, 800 F.2d at 1031.  However, the Eleventh Circuit has elaborated by noting: "'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."  McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986); see also 20 C.F.R. § 404.1521(a) (2003) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

The Commissioner argues the ALJ's failure to find Plaintiff's mental impairments to

be severe at step two is a harmless error because the ALJ continued with the sequential evaluation past step two.  (Doc. 15, p.13).  The Commissioner is correct that it is not necessarily error for an ALJ to fail to include a specific impairment in his step two analysis (so long as a severe impairment is found and the sequential analysis is continued).  However, the failure to address the severity of a specific impairment is reversible error where the record does not reveal the extent to which the impairment was considered at subsequent steps in the sequential evaluation.  Maziarz v. Secretary of Health and Human Services, 837 F.2d 240, 244 (6th Cir. 1987) (holding ALJ's failure to find plaintiff's cervical condition constituted severe impairment was not error because ALJ found other conditions were severe impairments and continued with the remaining steps in his disability determination); Williams v. Barnhart, 186 F.Supp.2d 1192, 1197-98 (M.D. Ala. 2002) (holding ALJ's failure to discuss impairments in subsequent steps after step two was error).  In this case, the ALJ continued his analysis after the step two severity finding and indeed noted that Plaintiff had "no more than mild limitation on her ability to sustain concentration, persistence, and pace and interact appropriately with others."  (Tr. 24).  As such, the Court finds the ALJ did not commit reversible error in failing to find Plaintiff's mental impairments were severe impairments.

The Court is concerned, however, that the ALJ erred in discounting the medical records regarding Plaintiff's mental impairments and in determining Plaintiff's RFC with respect to her mental abilities.  The ALJ placed great weight on his belief that Plaintiff's condition would allow her to work so long as she continued taking her medications.  Specifically, the ALJ discounted the findings of the two state agency non-examining physicians who determined Plaintiff had severe mental impairments.  The ALJ indicated he

considered these opinions but stated he "gave greater weight to new medical evidence not previously considered and to the longitudinal record that shows the claimant to have an adequate level of functioning as long as she takes medication and obtains counseling."  (Tr. 20).   Additionally, the ALJ discounted Plaintiff's credibility and noted:

> The medical evidence also shows that with appropriate medication compliance and counseling, the claimant's mental status is within normal limits including euthymic mood, full affect, normal speech, and appropriate appearance.  As long as she takes her medication as prescribed, she has told Dr. Herbly she gets along better with others and has less irritability and less feelings of anger.

(Tr. 22).  While the record does show Plaintiff's condition improves when she takes her medication, it also reflects that Plaintiff does not always take her medication and when she does not, her symptoms and condition worsen.  Indeed, Plaintiff has attempted suicide on at least two[8] occasions since 2000.

"Failure to follow prescribed treatment is relevant in evaluating the credibility of Plaintiff's subjective complaints."  Wright v. Barnhart, 284 F.Supp.2d 1277, 1282 (D. Kan. 2003).  In Wright, the ALJ rejected the medical opinions of treating physicians regarding the plaintiff's mental condition because the plaintiff's condition improved when he took his medication.  Id.  In finding the ALJ committed error, the court noted that the ALJ should have examined why the plaintiff was not taking his medication to determine whether the plaintiff's mental impairments may have constituted a justifiable excuse for Plaintiff's failure to take his medication.  Id.

Likewise, in the instant case, the Court believes such analysis is necessary.  While

---

[8] The medical records demonstrate hospitalization for two suicide attempts, however, Plaintiff reported two other less serious attempts since 2000.  (Tr. 496, 511).

the ALJ specifically found Plaintiff only had mild limitations because of her mental impairments, this finding is based on Plaintiff taking her medication.  Because the Court is remanding the case for the ALJ to reconsider Plaintiff's ability to perform her past relevant work, he should also examine Plaintiff's reasons for discontinuing her medication.  There is evidence in the record that some of her medications needed to be discontinued because she could no longer afford them.  Additionally, the ALJ should determine whether Plaintiff's depression itself has any effect on her failure to take her medications.  Based on his findings, the ALJ shall re-evaluate Plaintiff's credibility and the medical evidence regarding Plaintiff's mental impairments and shall re-examine Plaintiff's RFC.

### Whether the ALJ committed error in finding Plaintiff engaged in substantial gainful activity after her alleged onset date.

Finally, Plaintiff argues the ALJ erred in his determination that Plaintiff engaged in substantial gainful activity after her alleged onset date.  The Commissioner responds that this argument lacks merit because the ALJ gave Plaintiff the benefit of the doubt and continued on with his analysis through step four.  The Commissioner is correct that were the Court not remanding the case for other reasons, it would not do so based on Plaintiff's substantial gainful activity argument.  However, as the case is being remanded and the determination regarding substantial gainful activity may affect Plaintiff's benefits, the ALJ is directed to re-evaluate the question of whether Plaintiff has engaged in substantial gainful activity since her alleged onset date of October 1, 1999.  The record appears to contain

contradictory information[9] and therefore the ALJ is to further develop the record as he sees fit.

## IV.     CONCLUSION

For the foregoing reasons, the Commissioner's decision is hereby **REVERSED** and **REMANDED** pursuant to sentence four, 42 U.S.C. 405(g).  On remand, the ALJ shall consider whether or to what extent Plaintiff's mental impairments affect her ability to continue taking her medications.  In light of any such finding, the ALJ shall re-evaluate the medical opinions and evidence regarding Plaintiff's mental impairments and re-determine her mental RFC.  The ALJ shall also determine, based on the RFC, whether Plaintiff is able to perform her past relevant work or other work existing in the national economy.  Finally, the ALJ shall re-examine whether Plaintiff has engaged in SGA since her alleged onset date.  The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this  7th  day of February, 2007.

_Monte C. Richardson_

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record

---

[9] For example, on May 31, 2002, a SSA representative found the work performed by Plaintiff was not SGA as her earnings were below the monthly limit and therefore, the October 1, 1999 onset date was correct.  (Tr. 120).  However, in her work activity report, Plaintiff reports three months in 2002 where she earned more than the monthly limit.  (Tr. 147).  Despite this, the SSA representative reviewing the report found Plaintiff had not engaged in SGA.  (Tr. 152).